

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

## NO. PD-0504-20

**APRIL LOREACE WILLIAMS, Appellant**

**v.**

**THE STATE OF TEXAS**

## ON STATE'S PETITION FOR DISCRETIONARY REVIEW FROM THE FOURTH COURT OF APPEALS GUADALUPE COUNTY

**WALKER, J., filed a dissenting opinion.**

## DISSENTING OPINION

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial[.]" U.S. CONST. amend. VI. This right to a public trial is an important one, predating "the ratification in 1791 of the Federal Constitution's Sixth Amendment[.]" *In re Oliver*, 333 U.S. 257, 266–67 (1948) ("In this country the guarantee to an accused of the right to a public trial first appeared in a state constitution in 1776."); *Press-Enter. Co. v. Superior Ct.*, 464

U.S. 501, 505 (1984) ("The roots of open trials reach back to the days before the Norman Conquest[.]"). The public trial right is a personal one, acting for the benefit of the accused. *Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 380 (1979); *Lilly v. State*, 365 S.W.3d 321, 328 (Tex. Crim. App. 2012). This right serves numerous purposes, such as helping "ensure a fundamentally fair process, since the public's very presence there helps keep judges, prosecutors, and witnesses on their toes[,]"[1] allowing the public to see that the accused "is fairly dealt with and not unjustly condemned,"[2] improving "the quality of testimony, induc[ing] unknown witnesses to come forward with relevant testimony, caus[ing] all trial participants to perform their duties more conscientiously, . . . generally giv[ing] the public an opportunity to observe the judicial system[,]"[3] and discouraging perjury.[4] Open courts also encourage faith in our judicial system. *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 571–72 (1980).[5] The public trial guarantee has always been recognized as a safeguard against attempts to employ our courts as instruments of unjust persecution, and the knowledge that criminal trials are "subject to contemporaneous review in the forum of public

---

[1]*United States v. Acosta-Colón*, 741 F.3d 179, 187 (1st Cir. 2013) (citing *Waller v. Georgia*, 467 U.S. 39, 46–47 (1984)).

[2]*Waller*, 467 U.S. at 46 (quoting *Gannett Co.*, 443 U.S. at 380).

[3]*Gannett*, 443 U.S. at 383.

[4]*Waller*, 467 U.S. at 46.

[5]After recounting the history of the right to a public trial, Chief Justice Burger notes in his plurality opinion that
> [a] result considered untoward may undermine public confidence, and where the trial has been concealed from public view an unexpected outcome can cause a reaction that the system at best has failed and at worst has been corrupted. To work effectively, it is important that society's criminal process 'satisfy the appearance of justice,' . . . and the appearance of justice can best be provided by allowing people to observe it.

*Richmond Newspapers*, 448 U.S. at 571–72 (quoting *Offutt v. United States*, 348 U.S. 11, 14 (1954)).

2

opinion is an effective restraint on possible abuse of judicial power." *Oliver*, 333 U.S. at 270; *see also Huminski v. Corsones*, 396 F.3d 53, 81 (2d Cir. 2005) (noting public trial right also protects against prosecutorial abuse). Further, "'the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions[.]'" *Waller*, 467 U.S. at 46 (quoting *Gannett*, 443 U.S. at 380).

The U.S. Supreme Court and this Court have held that a violation of the Sixth Amendment right to a public trial is a structural error. *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1908 (2017); *Lilly*, 365 S.W.3d at 328. Structural errors "affect[] the framework within which the trial proceeds," and are not merely errors "in the trial process itself." *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991). "The purpose of the structural error doctrine is to ensure insistence on certain basic, constitutional guarantees that should define the framework of any criminal trial." *Weaver*, 137 S. Ct. at 1907. A violation resulting in a structural error does not require a showing of harm—it is impervious to a harm analysis. *Fulminante*, 499 U.S. at 309–10; *Lily*, 365 S.W.3d at 328. "[I]n the case of a structural error where there is an objection at trial and the issue is raised on direct appeal, the defendant generally is entitled to 'automatic reversal' regardless of the error's actual 'effect on the outcome.'" *Weaver*, 137 S. Ct. at 1910 (quoting *Neder v. United States*, 527 U.S. 1, 7 (1999)).

The majority is correct in pointing out that the public trial right is subject to exceptions, and a court's closure will not always result in structural error warranting reversal. *Id.* at 1909. However, the Supreme Court has concluded that "a presumption of openness inheres in the very nature of a criminal trial under our system of justice." *Richmond Newspapers*, 448 U.S. at 573. And the cases where a judge may properly deprive a defendant of his personal right to an open courtroom should be rare. *Weaver*, 137 S. Ct. at 1909; *Waller*, 467 U.S. at 45; *Lilly*, 365 S.W.3d at 328.

The Supreme Court, the ultimate arbiter of constitutional law and the only federal court whose precedents are binding on this Court, has determined that closing a courtroom to the public is justified only if: (1) the party seeking to close the courtroom advances "an overriding interest that is likely to be prejudiced," (2) the closure is "no broader than necessary to protect that interest," (3) the trial court considers "reasonable alternatives to closing the proceeding, and" (4) the trial court makes "findings adequate to support the closure." *Waller*, 467 U.S. at 48. The "findings adequate to support the closure" should be "'specific enough that a reviewing court can determine whether the closure order was properly entered.'" *Id.* at 45, 48 (quoting *Press-Enter. Co.*, 464 US at 510); *see also Lilly*, 365 S.W.3d at 329 ("The findings must be on the record and specific."). "'[B]road' or 'generic' concerns will not serve to justify closure; otherwise they could become talismans for exclusion of the public in any and every case." *Steadman v. State*, 360 S.W.3d 499, 506 (Tex. Crim. App. 2012) (citing *Presley v. Georgia*, 558 U.S. 209, 215 (2010)). "Proper findings will identify the overriding interest and how that interest would be prejudiced, why the closure was no broader than necessary to protect that interest, and why no reasonable alternatives to closing the proceeding existed." *Lilly*, 365 S.W.3d at 329 (citing *Presley*, 558 U.S. at 215). Balancing the right to a public trial with the interests of the party seeking to close the courtroom must be done "with special care." *Waller*, 467 U.S. at 45.

In this case, the trial court closed the courtroom to Appellant's brother, Jerry Williams, on the State's bare assertion that it had "credible and reliable information that it would be very intimidating" for its witness to testify in front of Appellant's brother. The entire conversation

proceeded as follows:[6]

THE COURT: Are we ready?

MS. HINES-WRIGHT: We are, Your Honor.

THE COURT: All right. Go ahead and --

MS. HINES-WRIGHT: At this point, Your Honor, the State would ask that the Courtroom be closed to Jerry Williams in the interest of not intimidating our witness to testify. The State has set up Skype so that he can watch it from another room, but we're asking that he be excluded from the courtroom because we have credible and reliable information that it would be very intimidating to our witness for him to be in the courtroom to testify. The State has provided the Court with caselaw supporting closing the courtroom because of the intimidation factor.

MR. PEREZ: Judge, defense would have to object. Number one, the State has not provided the Court any evidence of this information that allegedly would cause the witness to be in fear of testifying or intimidated of -- intimidated. I believe the caselaw says that the State has to provide specific facts to support that notion and, at this point, they've provided none. Therefore, their argument at this point is conclusory. Second, Judge, I would object on the basis that one of the ways the Jury evaluates the credibility of a witness is by observing them on the witness stand, observing their behavior, their body language, their eye contact, their mannerisms and that is meant, in my opinion, to be tested with the defendant obviously confronting her accuser, but also the -- the idea is that the witness is making his claims in open court subject to being observed by whoever is in open court.

I think to exclude people from the courtroom would essentially give the witness the ability to testify in a consequence-free environment without -- essentially without having to worry about -- let me rephrase.

Basically, if the witness is able to testify in a closed environment, I think that gives him an advantage over any other witness and I think that advantage prejudices my client, so I -- I would respectfully have to object.

MS. HINES-WRIGHT: Your, Honor, the only person who has a right to confrontation is April Williams. April Williams will be sitting at that table. We are not saying that Jerry Williams cannot watch this person testify; however, the

[6]Ms. Hines-Wright acted as counsel for the State. Mr. Perez acted as Appellant's trial counsel.

5

only reason he would be sitting in this courtroom is to intimidate a confidential informant. I was the former drug and gang interdiction prosecutor, I have prosecuted capital murder cases where confidential informants were killed and/or intimidated during the course of their testimony and I think there's zero reason behind -- behind keeping him in the courtroom. We're not violating open court if we let him watch by Skype from another courtroom.

THE COURT: All right.

MR. PEREZ: And also, Judge, once again, there's been no evidence -- there's been no proffer of evidence that the State says they have to substantiate this request.

MS. HINES-WRIGHT: Your Honor, the fact he's a confidential informant has been proffered to the Court.

THE COURT: The Court finds that the State's interest outweighs the defendant's right of -- to public scrutiny. The Court finds that exclusion of Jerry Williams from the courtroom during the testimony of the confidential informant is necessary to protect the confidential informant from intimidation that would traumatize him or render him unable to testify. This exclusion from the courtroom is temporary and only for the testimony of the confidential informant, and the Court finds that a reasonable alternative for Jerry Williams would be to watch the testimony in a live video stream feed from another room.

And that will be the order of the Court.

Notably missing from the record is any evidence, or findings, that would support the State's assertion that Mr. Williams would actually intimidate the witness. The State said that the witness is a "confidential informant"; however, testimony from confidential informants is common in criminal trials. Confidential informants inherently understand that their testimony could place them in danger of retaliation and that knowledge alone can make testifying somewhat intimidating. However, in this case, there is no actual evidence that the confidential informant would have been intimidated by the Appellant's brother being in the courtroom. A prosecutor's assertion is not evidence.

Surely, we are not allowing defendants' family members, who are members of the public at

6

large,[7] to be excluded merely because a confidential informant will be testifying. *Cf. Oliver*, 333 U.S. at 271–72 ("[A]n accused is at the very least entitled to have his friends, relatives and counsel present, no matter with what offense he may be charged."). We would be excluding members of the public from the courtroom in nearly every criminal trial involving controlled substances. The prosecutor's recollection of former cases in which "confidential informants were killed and/or intimidated during the course of their testimony" does nothing to prove that Appellant's brother's presence in the courtroom would have intimidated the confidential informant in this case.

Additionally, regarding the public trial right's purpose of discouraging perjury,[8] the majority notes that although the witness's testimony was important to the State's case, video evidence was admitted depicting the transaction between the witness and Appellant, thereby—according to the majority—reducing the importance of the testimony and reducing the probability of perjury. This, in effect, amounts to nothing more than a harm analysis—which does not apply to Sixth Amendment public trial violations. *Fulminante*, 499 U.S. at 310 ("[T]he category of constitutional errors which are not subject to harmless error" includes "the right to public trial[.]"); *Lilly*, 365 S.W.3d at 328. Further, the majority's reasoning seems to imply that the availability of the public trial right correlates with the importance of a witness's testimony, something neither the Supreme Court, nor this Court, has ever held.

A video cannot and does not capture everything. It is not difficult to imagine a scenario where an individual in the courtroom knows more than what is portrayed by the evidence already admitted

---

[7] *See Weaver*, 137 S. Ct. at 1909 (noting "the family of the accused" is one of the "various constituencies of the public").

[8] *Waller*, 467 U.S. at 46

7

in trial—even if that evidence is a recording of the offense in question—and his mere presence in the courtroom encourages the witness to tell the truth. This is not intimidation. It is a measure of accountability for the testifying witness who is, by law, supposed to be telling the truth. *See* TEX. R. EVID. 603 (oath requirement); TEX. PENAL CODE Ann. § 37.02 (perjury statute). Additionally, barring such an individual from the courtroom means the finder of fact, the ultimate judge of credibility,[9] could miss out on observing the witness's credibility in front of someone who knows the whole story. A live feed is not a substitute for this—despite the majority's implication that the live feed was as effective as allowing Mr. Williams in the courtroom.

This Court has required a new trial due to a courtroom closure based on findings even more specific than those provided here. For example, in *Steadman v. State*, the trial court refused to allow Steadman's family in the gallery during voir dire. 360 S.W.3d at 500. The defense objected, and the trial court gave no reason for its ruling at that time beyond stating, "I don't believe we have enough room." *Id.* Steadman appealed, and the court of appeals remanded the cause to the trial court for additional findings of fact. *Id.* at 501. The trial court went on to enter "detailed written findings" noting, among other things, that the trial court "believed that having one or more of the Defendant's family members sitting in close proximity to the panel members would make such panel members uncomfortable and reticent to fully express their feelings, attitudes and possible prejudices[;]" "[a]llowing persons other than the parties, their attorneys, the attorney's staff and court personnel in this space creates security concerns[;]" "security concerns are heightened in this case[;]" and "[t]he Court did not seek to close the voir dire process but only to control the courtroom arrangement

---

[9]*Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011) (noting trier of fact is the "sole judge" of the credibility of the evidence).

for security and decorum purposes." *Id.* at 501–02. The court of appeals subsequently found that the

trial court's exclusion of Steadman's family members was justified because "the trial court advanced

an overriding interest that was likely to be prejudiced: security." *Id.* at 503. We reversed and

remanded the proceeding for a new trial, finding that while jury-panel contamination and courtroom

security "could well prove sufficient to override a defendant's right to a public trial in the abstract[,]"

the trial court failed to "'articulate' a tangible 'threat' to either of the interests he identified." *Id.* at

506, 510–11.[10]

According to Supreme Court precedent, if a trial was closed,[11] the reviewing court decides

whether the closure was proper using the *Waller* analysis. *See e.g.*, *Waller*, 467 U.S. at 48; *Lilly*, 365

S.W.3d at 329. Despite the flimsy "evidence" purporting to justify the trial court's closure of the

courtroom, and despite Appellant's family member not being allowed in the courtroom for a portion

of the trial, the majority dismisses the Supreme Court's *Waller* standard and instead adopts a

"triviality" standard. The majority concedes that a strict application of *Waller* would result in a

reversal of the conviction,[12] and consequently decides to apply a triviality standard as opposed to a

_____

[10]We also found that the trial court failed to consider all reasonable alternatives to closure. *Steadman*, 360 S.W.3d at 508–10.

[11]The majority declines to decide the case "solely" on the issue of whether the courtroom was actually closed to the public; it says that it agrees with the State that the courtroom was not closed in the "traditional sense." Yet, two sentences later, the majority argues against the State's position and points out serious fairness concerns. Thus, it is unclear to me whether this portion of the majority's opinion is attempting to set out precedent or dicta. Accordingly, I have confined my dissent to Part D of the majority opinion. I do, however, have serious doubts as to the majority's quasi-conclusion that there was no actual closure in this case—particularly as a large part of the majority's analysis is based on non-precedential cases addressing live streams of trials for COVID purposes, an analogy that is not apt here.

[12]Majority op. at 22 n.16.

strict *Waller* analysis—which was created, and has been approved of, by the Supreme Court. *See e.g.*, *Waller*, 467 U.S. at 48; *Presley*, 558 U.S. at 213–14. The majority then upholds the conviction under the triviality standard.

In doing so, the majority suggests that it does not believe the trial court's closure to Mr. Williams caused any harm; it notes that undertaking a *Waller* analysis would lead to a result that "makes no sense under the facts of the case and would grant a windfall to the defendant[.]" Majority op. at 22 n.16. It further states, "We decline to apply *Waller*'s . . . test to determine whether the closure here was justifiable when the facts fail to show that Appellant was in any real sense deprived of the protections of the Sixth Amendment." *Id*. Thus, the Court, in determining whether or not to apply the triviality standard, essentially conducted a harm analysis. Yet, the difficulty in assessing harm is the reason public trial violations are structural errors and not subject to a harm analysis. *Weaver*, 137 S. Ct. at 1910 ("[T]he Court has said that a public-trial violation is structural for a different reason: because of the 'difficulty of assessing the effect of the error.'") (quoting *United States v. Gonzalez-Lopez*, 548 U.S. 140, 149 n.4 (2006)).

I see no need for our Court to adopt a standard other than the one already laid out by the Supreme Court. The *Waller* analysis is administrable by trial courts—it is not unworkable or overly convoluted—and it strikes a proper balance between respect for an accused's right to a public trial and any substantial overriding interests that may arise. Accordingly, I would apply the *Waller* analysis. I agree with the majority in that *Waller* would require a reversal and new trial as the findings purporting to justify the closure in this case were not "adequate to support the closure." *See*

*Waller*, 467 U.S. at 48.[13]

In light of the Supreme Court jurisprudence discussed above, and the emphasis the Supreme Court has put on specific findings to support closing a courtroom, I am skeptical that excluding an individual from the courtroom on such flimsy evidence—evidence that essentially amounts to nothing more than the State saying, "take my word for it"—could *ever* pass constitutional muster and not be considered a structural error warranting reversal.[14] When we are presented with an emerging question of law, I believe we should err on the side of preserving constitutional rights—not adopting mechanisms that circumvent those rights. I respectfully dissent.

Filed: September 28, 2022
Publish

---

[13]An argument could be made that the other three prongs of the *Waller* test were met; however, the *Waller* test is not a factor, or balancing, test. Rather, it lists four requirements for a closure of a courtroom to be acceptable under the Sixth Amendment. *Waller*, 467 U.S. at 48; *see also Lilly*, 365 S.W.3d at 332–33 (finding, without addressing the other three prongs of the *Waller* analysis, that courtroom closure was not justified under the *Waller* test because the findings of fact were inadequate and did not justify closing Lilly's trial).

[14]This is not to say that witness intimidation is not an overriding interest that could justify a closure of the court. As the majority notes, witness intimidation has been identified as a substantial interest that may justify a partial closure. However, there is no evidence in this case that witness intimidation would have actually occurred. For all we know based on the record, the State could have simply looked at Mr. Williams and perceived his physical appearance as threatening.