[J-83-2022] [MO: Todd, C.J.]
**IN THE SUPREME COURT OF PENNSYLVANIA
MIDDLE DISTRICT**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 40 MAP 2022 |
| | : | |
| Appellant | : | Appeal from the Order of the |
| | : | Superior Court at No. 856 EDA 2017 |
| | : | dated July 29, 2021, |
| v. | : | Reconsideration Denied October 13, |
| | : | 2021, Reversing the Judgment of |
| | : | Sentence of the Montgomery County |
| NAZEER TAYLOR, | : | Court of Common Pleas, Criminal |
| | : | Division, at No. CP-46-CR-0003166- |
| Appellee | : | 2014 dated January 31, 2017 and |
| | : | Remanding. |
| | : | |
| | : | ARGUED: November 30, 2022 |

**DISSENTING OPINION**

**JUSTICE MUNDY**                           **DECIDED: January 29, 2024**

The Majority holds that the juvenile court's consideration of Taylor's refusal to admit wrongdoing during the certification process for criminal offenses committed as a juvenile in violation of the Fifth Amendment right to be free from compulsory self-incrimination amounts to structural error. Majority Op. at 1-2. I disagree. In my view, this type of constitutional violation is subject to harmless error review and was, indeed, harmless in this case. Though I would not reach the question of remedies based on my finding of harmless error, assuming that the error is structural, I disagree with the Majority's decision to discharge Taylor. I therefore dissent.

In *Chapman v. California*, 386 U.S. 18 (1967), the United States Supreme Court declined to find "that all federal constitutional errors, regardless of the facts and circumstances, must always be deemed harmful." *Id.* at 21. In doing so, the Court

adopted the harmless error test announced in its earlier decision *Fahy v. Connecticut*, 375 U.S. 85 (1963), holding that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Id.* at 24. Subsequently, in *Arizona v. Fulminante*, 499 U.S. 279, 309 (1991), the Court addressed whether the improper admission of a coerced confession at a criminal trial court is, consistent with *Chapman*, subject to harmless error analysis.

Fulminante was charged with the murder of his eleven-year-old step-daughter. During trial, the prosecution introduced evidence of two coerced confessions in which Fulminante admitted to the murder and provided details about the crime. The Court ultimately concluded admission of a coerced confession was subject to harmless error analysis. In doing so, the Court distinguished between "trial errors," or errors that occur during the presentation of the case to a jury for which harmless error analysis is appropriate, and "structural defects in the constitution of the trial mechanism" which "defy analysis by 'harmless error' standards." *Fulminante*, 499 U.S. at 307-08, 310. Applying these frameworks, the Court reasoned that "[t]he admission of an involuntary confession is a 'trial error,' similar in both degree and kind to the erroneous admission of other types of evidence." *Id.* It went on to explain that:

> When reviewing the erroneous admission of an involuntary confession, the appellate court, as it does with the admission of other forms of improperly admitted evidence, simply reviews the remainder of the evidence against the defendant to determine whether the admission of the confession was harmless beyond a reasonable doubt.
>
> Nor can it be said that the admission of an involuntary confession is the type of error which "transcends the criminal process." This Court has applied harmless-error analysis to the violation of other constitutional rights similar in magnitude and importance[.]

*Id.* at 310-11. The Court nevertheless determined that admission of Fulminante's coerced confessions in his case could not be deemed harmless.

Several years ago, in *Weaver v. Massachusetts*, 582 U.S. 286 (2017), the Court sought to clarify what types of errors qualify as structural. In doing so, it outlined three categories it found unamenable to harmless-error analysis. It first noted that "[a]n error has been deemed structural in some instances if the right at issue is not designed to protect the defendant from erroneous conviction but instead protects some other interest[,]" such as a defendant's right to conduct his own defense, as "[t]hat right is based on the fundamental legal principle that a defendant must be allowed to make his own choices about the proper way to protect his own liberty." *Id.* at 295 (citation omitted). "Second, an error has been deemed structural if the effects of the error are simply too hard to measure." *Id.* Examples of this type of structural error would include the denial of a defendant's right to select his own attorney, considering "the precise effect of the violation cannot be ascertained." *Id.* (citation and quotations omitted). Lastly, the Court explained "an error has been deemed structural if the error always results in fundamental unfairness." *Id.* at 296. An example of this would be a judge's failure to give a reasonable-doubt instruction or the denial of an attorney for an indigent defendant. *Id.* at 296 (citations omitted).[1]

Here, the Majority concludes that the juvenile court's consideration of Taylor's refusal to admit wrongdoing during the certification process falls under each of the three categories of errors deemed structural. I disagree. With respect to the first category, the Majority reasons that the Fifth Amendment right to be free from self-incrimination is "not only designed to protect a criminal defendant from erroneous conviction, but one which protects another vital interest – namely, the right to be shielded from coercion by those

---

[1] As recognized by the Majority, though certification hearings are not criminal trials, the United States Supreme Court has found that such proceedings "must afford the juvenile fundamental constitutional protections." Majority Op. at 33 (citing *Breed v. Jones*, 421 U.S. 519, 535 (1975)).

cloaked with official authority into providing facts or information which can then be used as evidence for his later prosecution and imprisonment." Majority Op. at 36. In my view, where a coerced confession in a criminal trial was deemed subject to harmless-error analysis in *Fulminante*, the circumstances herein at a certification hearing cannot then reach the level of structural error precluding a harmless error analysis.

As to the second and third categories, the Majority finds that consideration of a juvenile's failure to admit guilt in the certification process "becomes intertwined with the decision to certify the case." *Id.* at 39. In its view, "[i]t is this entanglement which renders it impossible for an appellate court, on the basis of a cold record, to meaningfully assess its effect on the certifying judge's evaluation and weighing of the other evidence, due to the fact that the constitutional violation infected the juvenile court's entire decision-making process." *Id.* It further opines that the juvenile court's improper consideration in this case "in effect, created an irrebuttable presumption that, if the juvenile refuses to incriminate himself, he is not amenable to treatment, supervision, and rehabilitation, no matter what the other competent evidence of record demonstrates." *Id.* at 40 (citations omitted). Again, I disagree on both fronts for similar reasons.

To begin, the Majority's rationale discounts our juvenile court judges' ability to follow the statutory requirements for certifying a case to adult criminal court, for which they are required to consider amenability to treatment, supervision, or rehabilitation, among a variety of other factors. *See* 42 Pa.C.S. § 6355(a). It also minimizes our appellate courts' ability to engage in the same type of weight assessments they provide in cases involving the vast majority of other constitutional violations. In my view, factor-based assessments like the one in this case are precisely the type that our courts are equipped to "qualitatively assess[] in the context of other evidence presented in order to determine whether [the error was] harmless beyond a reasonable doubt." *See United*

*States v. Gonzales-Lopez*, 548 U.S. 140, 148 (2006). In sum, the impact of a juvenile court's improper consideration of a juvenile's failure to admit guilt insofar as it suggests amenability to treatment, supervision or rehabilitation can quite simply be assessed by reviewing the certification hearing transcript and/or the accompanying opinion. Having concluded that the instant error does not fall under any of the categories for structural error, I would assess its impact under harmless-error analysis.

With respect to harmless error, this Court has explained that "an error can be harmless only if the appellate court is convinced beyond a reasonable doubt that the error is harmless." *Commonwealth v. Story*, 383 A.2d 155, 162 (Pa. 1978). Additionally, "an error cannot be held harmless unless the appellate court determines that the error could not have contributed to the verdict." *Id.* In the context of this case, the relevant question is whether the juvenile court's consideration of Taylor's refusal to admit wrongdoing could not have contributed to the decision to certify. Harmless error may be found under the following three circumstances:

> (1) the error did not prejudice the defendant or the prejudice was *de minimis*;
> (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

*Commonwealth v. Chmiel*, 889 A.2d 501, 521 (Pa. 2005) (citation omitted). The first scenario is the only one that applies herein.

On April 2, 2016, the juvenile court held a certification hearing at which the Commonwealth presented the testimony of two witnesses. The victim testified that Taylor had orally and anally sodomized him, resulting in difficulty controlling his bowels and severe mental anguish. N.T., 4/2/26, at 9, 11-30, 33. The victim's foster mother also testified to observations that made her suspicious Taylor and the victim had engaged in

sexual activity. *Id.* at 79-80, 84-85. As a result, juvenile court found the Commonwealth established a *prima facie* case that Taylor committed the offenses alleged in the delinquency petition. Due to Taylor's age and prior adjudications, the burden shifted to Taylor to establish by a preponderance of the evidence that his case should remain in juvenile court. *See* 42 Pa.C.S. § 6355(g).

The certification hearing was continued to April 25, 2016, at which Taylor presented the testimony of Dr. Nicole Machinski, a licensed clinical psychologist. Dr. Machinski opined that Taylor was amenable to treatment in the juvenile system. She detailed his upbringing, which included neglect, sexual abuse, exposure to domestic abuse, and an array of related mental health issues. N.T., 4/25/16, at 14-15. She further noted that Taylor's various issues appeared to abate with therapy. *Id.* at 15-18. Dr. Machinski also testified that Taylor's crimes did not evidence a level of sophistication but were rather "typical" of inappropriate juvenile sexual behavior. *Id.* at 21. As for duration of treatment, Dr. Machinski explained that Taylor – seventeen and one-half at the time of the hearing – would remain under the juvenile court's purview for three more years. She further explained that treatment programs for Taylor's conduct usually last 12 months. Thus, Taylor "could certainly be treated . . . within the timeframe that's available." *Id.* at 22. Dr. Machinski further expressed that Taylor's previous experience with treatment was minimal and that Taylor presently expressed a willingness to participate. *Id.* at 27.

On cross-examination, the Commonwealth questioned Dr. Machinski with respect to, *inter alia*, Taylor's prior treatment. The Commonwealth highlighted the fact that Taylor's treatment was not related to commission of sexual offenses, but rather a burglary. It also pointed out that Taylor committed the instant series of forcible rapes having already completed the treatment that Dr. Machinski described as effective. *Id.* at 41-44. In its attempt to demonstrate Taylor was not amenable to treatment, the

Commonwealth inquired: "Well, isn't it true that when one is in denial, sex offender treatment can take longer?" This question prompted a defense objection, which the juvenile court sustained.

The Commonwealth then presented the testimony of Michael Yoder, a supervisor employed at Montgomery County Juvenile Probation. Relevantly, Mr. Yoder disagreed with Dr. Machinski that Taylor's alleged behavior was unsophisticated or typical in the realm of inappropriate juvenile sexual behavior, explaining:

> [Yoder]: This was allegedly a series of forcible rapes over the course of a year. And, in most cases, what we see are a very few amount, very few number of more – I don't want to characterize it as experimentation, but it's not something to the degree and seriousness of what this is.
>
> [Commonwealth]: Okay. What about the expert said, in her opinion, it wasn't sophisticated, meaning the offense; do you agree with that or no?
>
> [Yoder]: I don't agree with that, no.
>
> [Commonwealth]: And why?
>
> [Yoder]: In listening to the testimony of the victim, the victim indicated that the defendant used food to bribe him to not talk, was doing this under the – while he was in a foster home placement, under the roof of the foster parents while the foster parents were at home, was going into the victim's room and allegedly committing these rapes, was going into the bathroom when the victim was in the bathroom and allegedly committing these rapes, as well.

*Id.* at 88-89. Mr. Yoder further noted that the instant assaults began just six months after Taylor's release from a residential treatment facility. He also explained that the timing of these incidents suggests an increasing level of seriousness in crime. *Id.* at 89. Overall, Mr. Yoder opined that Taylor was not amenable to treatment in the juvenile system:

> [Yoder]: I base my opinion on the seriousness of the crime, the fact that he has received treatment in the past, although it hasn't been through the juvenile probation system, it was through dependency court. . . . My opinion is that he's almost 18 years of age, that we will lose jurisdiction of him in a little bit over three years. And our experience has been that juvenile residential placements for sex offenders typically is at a minimum two years

in duration, so that would leave us, if he were to do well in placement and be release after a [two]-year commitment to a residential placement, if in fact he's adjudicated of the charges, that would leave us just a year of supervision after a release from placement.

*Id.* at 90-91. Lastly, the Commonwealth questioned Mr. Yoder about Dr. Machinski's final opinion:

[Commonwealth]: Now, you reviewed [Dr. Machinski's] final opinion about – she essentially says he's amenable because of these four or five things: [t]hat he expressed positive goals for the future; polite and respectful to those in a position of authority; strong bond with friend's parents' very little opportunity to benefit from mental health treatment. Those were her reasons that he's amenable. Do you agree with that or not?

[Yoder]: I don't, no.

[Commonwealth]: And can you tell the judge why you disagree with her assessment there, specifically?

[Yoder]: Well, in totality, none of those are specified under the act for amenability. There is nothing that references in the act that if he has positive goals, that that makes him amenable. Him being polite and respectful to those in a position of authority. He's demonstrated, I believe, in the past that he's been disrespectful. He was essentially ungovernable with his grandmother. When he was released from EIHAB and placed with his aunt, again, was ungovernable and have, I believe, reports had indicated he was using drugs while he was there, he was not following her directions, coming in after curfew. So[,] I find that that's not being respectful and polite to persons in a position of authority.

Again, his friend's parents that stated are a good source of support for him, from what I read from the records, he was only there for a short period of time – approximately four months that he was in placement with them, and he was placed with his grandmother for a longer period of time. He was placed with his original foster family for a longer period of time, and it doesn't indicate anything about him having a strong bond with them.

And lastly, the mental health treatment, he did receive mental health treatment while he was at Saint Mike's.

*Id.* at 95-96.

At the conclusion of the hearing, the juvenile court orally granted the transfer petition and certified the case to adult criminal court. In doing so, the juvenile court's complete rationale provided:

I think one of the Commonwealth's arguments is that the defendant has been in treatment for almost every issue that the defendant's expert has identified and, notwithstanding that treatment, within six months committed a series of forcible rapes, which is much more serious than the issue he was in treatment for.

I think the defense expert makes a distinction, and so does the defendant – or they make a good point, not necessarily a distinction when they say, look, the sex offense is totally different than the burglary. And because someone was successful in a burglary, that's not at all related to the sexual offense, and he never really got treatment for the sexual offense. That's basically the argument as I understand it.

And I don't necessarily disagree with that, but then I think the defense expert becomes a little bit inconsistent . . . with you can't compare these other matters to a sex offense, but then she goes back and forth and says but because he did well in treatment in the other matters, he will do well for treatment as a sex offender. So[,] in one sense, she tries to separate the two, and then in another sense, she tries to blend the two, and I find that testimony to be inconsistent.

I think another dilemma or conundrum for the defense is that's their approach, he's had an unfortunate upbringing, through no fault of his own. To a [ ] certain extent, he is antisocial and damaged, and that's not his fault. But is he so damaged that he can't be rehabilitated for a sex offender, or can he be rehabilitated for a sex offender? And I think part of the dilemma is they don't distinguish sex offenders from burglary, so now they blend their argument and say because he's done well in the first, he can do well in the second.

And they won't admit that he's committed the sex offense, and that's sort of their conundrum, because time is of the essence. He's approaching 18 years old. The act – you can argue degree of sophistication all you want, but it was a predatory damaging act that occurred repeatedly over a [one]-year period of time.

If you're going to go on the sex offenders' treatment, it's important that you admit, No. 1; examine your triggers, No. 2; talk about how you can avoid your triggers; and identify up-front the depth of the problem. And here, we

can't identify the depth of the problem largely because we're not admitting yet that there is a problem.

What if he were to sit there for a year and a half before he finally admitted that he did something? I mean, I assume he's still denying. Counsel's arguments have been phrased "if this is true, it's a horrendous act."

They made a distinction when he denied, when he said to Dr. Buxbaum -- I believe he was a psychiatrist – "I didn't do anything wrong." Counsel said now he wants to say he participates in treatment, and defense counsel argued, well, maybe the treatment's not talking about sex offenders' treatment. And that's the very issue, though, is he amenable to sex offenders' treatment? And, in the juvenile system, time is running out. As I said, there is only a few years left, and the depth – and if he doesn't make sufficient progress, he's [twenty-one], he's back on the streets, and he's released from the jurisdiction of the Court with no supervision at all. That's the dilemma.

And when Dr. Machinski in her report indicates the issues that he needs treatment in and the Commonwealth argues, well, none of this has to do with amenability within the statute, well, it might, when you have four other categories. It would certainly refer to amenability for a crime that's much less serious than this. But I don't know that it means anything with regard to somebody who's committed the type of act that he's alleged to have committed.

So[,] for all the reasons in the statute as enumerated by [the Commonwealth] and because it's the defense burden of proof, I'm going to grant the Commonwealth's motion to certify him to adult court.

*Id.* at 12-15. While the juvenile court did consider Taylor's failure to admit wrongdoing to an extent, I disagree that consideration of this factor had any more than a *de minimis* effect on the juvenile court's overall decision to certify the case to adult criminal court. The court set forth considerable other reasons for its determination. As such, I would conclude that the juvenile court's improper consideration of Taylor's failure to admit guilt for purposes of assessing amenability to treatment, supervision or rehabilitation was indeed harmless. I would therefore not reach the question of proper remedies and would reverse the Superior Court's order granting relief in the form of discharge.

Although my preferred resolution of this case would preclude me from reaching the question of remedies, I would be remiss if I did not mention an alternative to the Majority's conclusion that an outright discharge is the proper solution. Assuming that the error in this case is structural, there are reasonable alternatives that would not result in a total lack of accountability.[2] For example, the Majority could have remanded the case to the adult criminal court – a court of general jurisdiction – to determine whether the initial certification was proper absent consideration of the evidence that resulted in the constitutional violation. Pa. Const. Art. 5, § 5 (explaining courts of common pleas have "unlimited original jurisdiction in all cases except as may otherwise be provided by law"); see also 42 Pa.C.S. § 931(a). If the court were to find certification proper, Taylor's untainted conviction would stand.[3] That the juvenile court lacks jurisdiction over Taylor, at this stage simply means the adult criminal court must fill the gap. It is hard to imagine that the General Assembly would approve of a result that makes it so no court has jurisdiction under these circumstances.

I recognize that our recent decision in *Commonwealth v. Armholt*, 294 A.3d 364 (Pa. 2023), involves a different scenario than that presented in this case, but the same justifications apply herein. Similar to Taylor, Armholt committed a series of sexual assaults against his stepsister while a juvenile but was not prosecuted for these crimes until he was an adult. This Court held "adult criminal courts possess jurisdiction over the

---

[2] The same would apply if the Majority found the error subject to harmless error but not harmless instantly.

[3] If the adult criminal court alternatively found certification improper, then Taylor – who is no longer under the purview of the juvenile system – would then, and only then, be discharged. *See* 42 Pa.C.S. § 6303 (explaining the Juvenile Act applies exclusively to "[p]roceedings in which a child is alleged to be delinquent"); 42 Pa.C.S. § 6302 (detailing definition of "child" under the Juvenile Act).

prosecution of an individual who is over the age of twenty-one for crimes committed as a juvenile." *Id.* at 365. In reaching this decision, the Majority reasoned:

> Were we to adopt appellant's position that the adult criminal court lacked jurisdiction over him because he committed his crimes before the age of eighteen, it would mean that no court would have jurisdiction to try and sentence him. As a practical result, then, all juvenile offenders who escape prosecution until after they turn twenty-one could not be held accountable in any state court in this Commonwealth. This would effectively relieve juvenile offenders of all consequences of their criminal acts if not prosecuted before the age of twenty-one. We do not believe the General Assembly intended such a sweeping and drastic result.

*Id.* at 373. In his concurring opinion, Justice Wecht further remarked: "Armolt cannot escape prosecution for the serial abuse that he inflicted upon his stepsister merely because sufficient time has elapsed to place him beyond the reach of the Juvenile Act." *Id.* at 383 (Wecht, J., concurring). This instant result is similarly unconscionable.

As a final point, the Majority cites expediency as a basis for finding the instant error structural, stating: "[T]here is a unique risk that appeals in this context, if they include the time-consuming question of whether a particular error is harmless, will deprive juveniles and society of the protections afforded by the Juvenile Act, because they may not be adjudicated before the juvenile ages out of the juvenile system." Majority Op. at 44. Concluding that the instant error is structural is not the solution. Section 6355(f) of the Juvenile Act provides that "[t]he decision of the court to transfer or not to transfer the case shall be interlocutory." 42 Pa.C.S. § 6355(f). Though not required, Taylor could have sought permission to appeal the juvenile court's certification decision under 42 Pa.C.S. § 702(b), thereby avoiding the jurisdictional question in this case.[4] Under the Majority's

---

[4] In *Commonwealth v. Johnson*, 669 A.2d 315 (Pa. 1995), this Court concluded that the Commonwealth was permitted to appeal from an order granting transfer of a case from adult criminal court to juvenile court. It found that, from the Commonwealth's perspective, such an order qualified as an interlocutory appeal as of right under Pa.R.A.P. 311(d) given double jeopardy attaches at the initiation of a juvenile adjudicatory hearing. Where a

holding, however, there is no incentive to seek review prior to a final verdict. Those close to aging out of the juvenile system whose cases were transferred to adult criminal court would, as a matter of strategy, benefit from challenging the certification process after conviction in the hopes of a discharge. This result is not only unfair but also disproportionately beneficial to a defendant who, like Taylor, received a fair trial that resulted in a conviction. Such an absurd result could not have been contemplated by the legislature. Accordingly, I would refer this matter to the appropriate rules committee to consider whether the decision to transfer or not transfer a case under Section 6355(f) should be an interlocutory appeal as of right under Pa.R.A.P. 311 for both the Commonwealth and the juvenile alike.

For these reasons, I dissent.

---

juvenile seeks to appeal an order denying transfer to juvenile court, the order is interlocutory and non-appealable. As such, the juvenile must resort to 42 Pa.C.S. § 702(b) (pertaining to interlocutory appeals by permission) in order to obtain immediate review.