*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
December 15, 2025
9:42 AM

Plaintiff-Appellee,

v

No. 363237
Ingham Circuit Court
LC No. 20-000345-FC

DEVON CARL BALDWIN,

Defendant-Appellant.

Before: KOROBKIN, P.J., and MURRAY and MALDONADO, JJ.

PER CURIAM.

Defendant appeals as of right his June 17, 2022 jury-trial convictions of second-degree murder, MCL 750.317, felon in possession of a firearm (felon-in-possession), MCL 750.224f, and two counts of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. Defendant was sentenced as a third-offense habitual offender, MCL 769.11, to 600 to 800 months' imprisonment for his second-degree murder conviction, 30 to 60 months' imprisonment for his felon-in-possession conviction, and two years' imprisonment for each of his felony-firearm convictions. We affirm defendant's convictions and sentence.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This case arose out of the shooting death of Bradley Wicks at a home rented by Wicks's cousin, Garylee Dexter[1] (also known as "Flip"), and commonly referred to as "the Prairie." Defendant had been staying at the Prairie with Dexter leading up to the shooting on March 30, 2020. The Prairie was a home where people involved in the use and trade of methamphetamine often came and went.

On March 28, 2020, Wicks participated in a drive-by shooting at the Prairie. Rosemarie Arnold, who was romantically involved with Wicks at the time of his death, and had previously

---

[1] Dexter was charged as a codefendant in Wicks's murder, and testified in defendant's case as part of a plea agreement in his own case.

engaged in a romantic relationship with Dexter, testified that she drove to the Prairie that day, and as she slowed the vehicle in front of the house, Wicks and another man rolled down the windows and began shooting.

Two days later Wicks picked up his close friend Anthony Palmer and drove to the Prairie. Palmer had known both Wicks and Dexter for many years, and had previously lived at the Prairie. Palmer testified that Wicks told him he needed to go to the Prairie to talk to Dexter.

Multiple witnesses testified as to what happened after Palmer and Wicks arrived at the Prairie, with many of the accounts differing, at least to some degree, from the others. According to Palmer, when he and Wicks arrived, a number of people were at the house. He went into the living room, while Wicks went into the room with the wood stove, also referred to at trial as the dining room. Eventually, Dexter joined Wicks in the dining room. Palmer could hear a conversation taking place between Dexter and Wicks, during which Dexter was speaking loudly and Wicks was not. When Palmer heard a gunshot, he went into the dining room, and noticed defendant was standing in the room, as well. Wicks was not hit by that gunshot.

Palmer testified that he believed Dexter had fired the shot he heard, and he could tell Dexter was angry, so he put his hand on Dexter's shoulder, Dexter threw the gun he had been holding across the room, and he and Dexter walked out of the dining room and through the living room into the kitchen. Wicks remained in the dining room, and defendant eventually met Palmer and Dexter in the kitchen before returning to the dining room. As Palmer and Dexter headed out the back door towards the garage, Palmer heard six gunshots and ran back to the house and into the dining room, where he saw defendant take the last shot at Wicks with a gun Palmer described as a black .22-caliber, and Wicks lying on the floor.

According to Palmer, as he was walking over to Wicks, defendant walked past him and muttered, "It had to be done." Palmer then picked up Wicks, carried him through the garage, and dropped him off at McLaren Hospital.

Dexter testified that he spoke with Wicks about the drive-by shooting in the dining room of the Prairie on March 30, 2020, the conversation was heated, and he fired two rounds from a .380-caliber Smith & Wesson into the dining room floor, before throwing that firearm on top of a toolbox in the room. According to Dexter, after the shots, Palmer pulled him over to what he referred to as the small living room where he spoke to Palmer and a woman named Christina Burnett. He did not re-enter the dining room and was in the kitchen with Palmer when he heard five gunshots coming from the dining room.

Dexter then ran towards the dining room before heading out the door. He testified: "I seen [defendant] with a .22-caliber Walther in his hand and he looked shocked. Like, his eyes were big." Dexter continued out the breezeway door through the garage and down to the driveway where he and Burnett got into Burnett's truck and drove away. Dexter stated that Burnett had the .22-caliber gun he had seen defendant holding, but denied that Palmer had given it to him while he was in the truck. He proceeded to dump the gun and its parts out of the truck window while he and Burnett were driving.

-2-

Angela Tremblay was staying at the Prairie at the time of both shootings. She testified that on March 30, she heard yelling, and discovered that it was Dexter. When she went into the living room, she walked past the dining room and saw Wicks and Dexter. She testified that she then saw a conversation between Dexter, defendant, and Burnett, during which Dexter handed defendant a small handgun. It was not long after that she heard five shots coming from the dining room.

Wicks passed away on March 31, the day after the shooting, as a result of his injuries. An autopsy determined that Wicks's cause of death was gunshot wounds to the head.

## II. RIGHT TO PUBLIC TRIAL AND INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant asserts first that the trial court's closure of the courtroom to the public, which required spectators to watch the trial streaming in a separate room, violated his constitutional right to a public trial. Alternatively, defense counsel argues that his trial counsel was ineffective for failing to protect his right to a public trial.

### A. PRESERVATION AND STANDARDS OF REVIEW

As stated in *People v Davis*, 509 Mich 52, 64-65; 983 NW2d 325 (2022):

In order to waive a known right, a party must "clearly express[] satisfaction with a trial court's decision . . . ." *People v Kowalski*, 489 Mich 488, 503; 803 NW2d 200 (2011). In contrast, a party merely forfeits rather than waives an issue when that party fails to timely assert a right. *Id*. at 504 n 27.

As applied to the public-trial right, this Court has held that mere silence in the face of a courtroom closure results in forfeiture, not waiver, of the public-trial right. *People v Vaughn*, 491 Mich 642, 663-664; 821 NW2d 288 (2012).

A review of the record reveals a close call regarding whether defendant waived or forfeited his argument that he was deprived of his right to a public trial. Discussions regarding Covid precautions and the courtroom setup appear scattered throughout the lower court transcripts, but are somewhat vague. At the final pretrial conference on December 22, 2021, just under five months from the start of trial, the following exchange occurred, with defense counsel appearing to request Covid protocols:

*Defense Counsel*. Speaking of the circumstance that occurred in Judge Canady's court, I have not been in Your Honor's courtroom for quite some time. I'll stop by and take a look. I'm hopeful that Your Honor has not rearranged the courtroom to all is normal, all is well, the old-fashioned way.

*Court*. Not me.

*Defense Counsel*. I see Your Honor shaking your head.

*Court*. Not me. I'm the one holdout.

*Defense Counsel*. I appreciate that, Your Honor. I have trepidation particularly having to do with the situation of which I have recently been apprised having to do with what's going on at the jail. I want to make sure that everybody is safe and --

*Court*. Me, too.

\* \* \*

*Prosecutor*. No. I mean, the scenario is certainly different than one month ago, certainly different than when I started the last trial I did with Judge Canady, which was eight weeks ago. The horizon doesn't look like it's improving. It's just a concern.

*Court*. One of the things I think we'll need to do is probably pick 15 jurors instead of 14. That doesn't give you a lot of extra room, but at least an additional one in terms of alternates.

And on the first day of trial, defense counsel expressed satisfaction with the court's mask mandate, and declined to add anything during the following exchange regarding streaming the trial in a separate room:

*Court*. Ms. Smith, I think, has mentioned to Mr. Stevens [the prosecutor] that there were some folks who showed up today who wanted to have arrangements made for them to view the trial. It is being broadcast to the media room and so that's where folks -- unless there is some request by the Prosecutor to have other individuals in the courtroom, perhaps behind the Prosecutor's table. I think that's been mentioned to Mr. Stevens.

Correct, Mr. Stevens?

*Prosecutor*. It is.

*Court*. Okay. So you'll work out the logistics if that needs to happen. Other than that, is there anything else? [Defense counsel]?

*Defense Counsel*. No. Thank you.

Because we have found no evidence in the record that defense counsel expressed clear satisfaction with all of the specific Covid protocols employed by the trial court, including excluding members of the public from the courtroom, and because defendant also raises the issue of ineffective assistance of counsel, we proceed as if defendant forfeited, rather than waived, his public-trial argument. See *Davis*, 509 Mich at 64-65.

As stated in *Davis*, 509 Mich at 67-68 (footnote omitted):

When preserved, the erroneous denial of a defendant's public-trial right is considered a structural error. *Weaver v Massachusetts*, 582 US 286, 296; 137 S Ct

1899; 198 L Ed 2d 420 (2017). Structural errors "are structural defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards." *Arizona v Fulminante*, 499 US 279, 309; 111 S Ct 1246; 113 L Ed 2d 302 (1991). Because the harm rendered by these errors is extensive but intrinsic and difficult to quantify, preserved structural errors result in automatic relief to the defendant to "ensure insistence on certain basic, constitutional guarantees that should define the framework of any criminal trial." *Weaver*, 582 US at 295.

Although preserved structural errors are subject to automatic reversal, the alleged error here was forfeited. In order to receive relief on a forfeited claim of constitutional error, a defendant must prove that (1) error occurred, (2) the error "was plain, i.e., clear or obvious," and (3) "the plain error affected substantial rights." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). Further, "[r]eversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id*. (quotation marks, brackets, and citation omitted).

Ordinarily, "[t]he third requirement [of the plain-error test] . . . requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Carines*, 460 Mich at 763. However, our Supreme Court

modified the *Carines* "plain error" test as applied to unpreserved structural errors in [*Davis*]. In addressing the third prong, also known as the prejudice prong, the *Davis* Court held that a forfeited structural error creates a formal presumption that this prong of the plain-error standard has been satisfied. The formal rebuttable presumption in cases of forfeited structural error shifts the burden to the prosecutor to demonstrate that the error did not seriously affect the fairness, integrity, or public reputation of the judicial proceeding. In such instances, the prosecutor must present specific facts that affirmatively demonstrate that, despite the error, the overall fairness, integrity, and reputation of the trial court proceedings were preserved. [*People v King*, 512 Mich 1, 10; 999 NW2d 670 (2023) (quotation marks, citations, and alterations omitted.]

"Given th[e] conceptual overlap between the third and fourth prongs of the plain-error standard and that a forfeited structural error automatically satisfies the third prong of the plain-error standard, a forfeited structural error is very likely to also satisfy the fourth prong of the plain-error test." *Davis*, 509 Mich at 75-76.

"[A] defendant must move in the trial court for a new trial or an evidentiary hearing to preserve the defendant's claim that his or her counsel was ineffective," *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012), or move in this Court for remand to the trial court for a *Ginther*[2] hearing, *People v Abcumby-Blair*, 335 Mich App 210, 227; 966 NW2d 437 (2020). Defendant preserved his ineffective-assistance argument by moving in the trial court for a new

---

[2] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

trial or evidentiary hearing on the same basis, but the trial court declined to hold an evidentiary hearing and denied the motion. Thus, "this Court's review is limited to mistakes apparent from the record." *Heft*, 299 Mich App at 80.

"[W]hether a defendant had the effective assistance of counsel is a mixed question of fact and constitutional law. This Court reviews findings of fact for clear error and questions of law de novo." *Heft*, 299 Mich App at 80 (quotation marks, footnote, and citation omitted).

## B. ANALYSIS

The trial court did not plainly err by imposing spectator limitations in the courtroom.

The United States and Michigan Constitutions guarantee criminal defendants the right to a public trial. *Davis*, 509 Mich at 66, citing US Const, Am VI, and Const 1963, art 1, § 20. "The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of responsibility and to the importance of their functions . . . ." *Davis*, 509 Mich at 66 (quotation marks and citation omitted). The right also helps ensure that the court and the prosecutor ethically undertake their duties and encourages witnesses to testify truthfully. *Id*. But the public-trial right is not unlimited, and a courtroom closure may be warranted under certain circumstances. *Id*. Specifically, to justify a courtroom closure,

> there must be "an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure." [*Vaughn*, 491 Mich] at 653, quoting *Waller v Georgia*, 467 US 39, 48; 104 S Ct 2210; 81 L Ed 2d 31 (1984) (quotation marks omitted). [*Davis*, 509 Mich at 66-67.]

The record is somewhat scarce regarding the specific circumstances or logistics of the courtroom's closure to the public, although it is clear that Covid concerns were the driving force. In addition to the record discussions quoted above, on the ninth day of trial, during a break in the proceedings and in response to the prosecutor's concerns regarding the livestreaming of a witness' personal information into the extra room reserved for the public, the court stated:

> What you were referring to, I believe, is the fact that because of the COVID set-up in the courtroom that there is not room for general public observers or really much of anyone except for the deputies that are there and the people with [defense counsel's] defense team. So they are in another room and it's being streamed to that room, that's correct. The idea being it's no different than if somebody had walked into the courtroom.

And on the tenth day of trial, during which the court conducted evidentiary hearings outside the presence of the jury, the court stated:

> During the trial we have been streaming from the courtroom into a supplemental room, sometimes referred to as the media room, so that observers of the trial could watch in that room. The reason for that is because the courtroom is

still configured, as I mentioned a couple of times, loosely described as COVID precaution mode, meaning when the jury is in the courtroom and the two respective sides or teams are here, there really is not much in the way of supplemental seating.

We have to make special arrangements in order to keep the courtroom open and have an open proceeding. The way that's been handled is by streaming it to another room for folks who would otherwise walk into the courtroom and watch, watch in there.

Further, in its opinion and order denying defendant's motion for a new trial, which was filed after defendant's claim of appeal, the court reasoned:

Defendant's jury trial ran from May 10, 2022, to June 17, 2022. During the COVID-19 pandemic, courts were directed to take appropriate precautions to limit the spread of COVID-19 and ensure trials were conducted safely. The Court took several precautions in accordance with the SCAO Return to Full Capacity Guidelines and local administrative orders regarding in person proceedings: the courtroom was arranged for social distancing between the parties, courtroom staff, and between individual jurors, anyone present in the courtroom was required to wear a mask, and the Court made use of plexiglass barriers, hand sanitizer, disposable microphone covers, and antibacterial cleaning wipes. The Court also seated 15 jurors, at request of the parties, to account for the possibility of a juror contracting COVID-19.

\* \* \*

One of the limitations on the courtroom set-up utilized by this Court during the COVID-19 pandemic is that it limited public viewership in the courtroom itself due to the space required by social distancing guidelines to a small section of seating located behind the Prosecutor's table. As a result of this limitation, the Court streamed the proceedings live to a media room for public viewers in accordance with the Return to Full Capacity Guidelines.

\* \* \*

In this case, the Court did not close proceedings to the public. Rather, the Court followed the SCAO Return to Full Capacity Guidelines and guidance from Model LAO-51 as well as this Court's LAO C-30-2021-05J, and allowed public viewing up to the maximum room capacity allowable by social distancing measures.

Defendant correctly asserts that his trial was held over two years after the pandemic began, at a time when most people had the opportunity to be vaccinated. Additionally, although it is unclear whether Local Administrative Order C-30-2021-05J, cited by the court in its opinion and order denying defendant's motion for a new trial, remained in effect at the time of trial, SCAO Administrative Order No. 2020-14, on which the SCAO Return to Full Capacity Guidelines was

based,[3] was rescinded on July 26, 2021,[4] prior to the start of trial. So too were the executive branch orders that had placed restrictions on people and businesses. See State of Michigan, Rescission of Emergency Orders <https://www.michigan.gov/coronavirus/resources/orders-and-directives/lists/executive-directives-content/rescission-of-emergency-orders-2> (June 17, 2021). Indeed, Judge Jamo even stated at the December 22, 2021 final pretrial hearing, as it appeared to relate to Covid restrictions, that he was the court's "one holdout."

None of the above demonstrates an overriding interest or reason for the trial court to have imposed these Covid restrictions at the time of defendant's trial. Beyond vague indications of Covid issues approximately five months before trial, we see no evidence or explanation in the record as to why substantial Covid restrictions were still necessary during defendant's trial held from May to June 2022, nor does the prosecution direct the Court to such. And, again, the judicial and executive branches restrictions had been rescinded almost a year prior to the start of trial. Thus, we hold that the trial court erred by restricting public access to the courtroom during defendant's trial.

Nevertheless, the court's error was not plain. Both defense counsel and the prosecutor at the very least acquiesced, if not outright supported, the court's Covid restrictions, including its limitations on public access to the courtroom, contradicting any assertion that the trial court's error was "clear or obvious." *Davis*, 509 Mich at 67 (quotation marks and citation omitted). And the record demonstrates that the trial court imposed the restrictions it did in an effort to limit the spread of any existing Covid.

Moreover, the closure of the courtroom was no broader than necessary to protect against the spread of Covid infections. To allow for social distancing, the court accommodated the deputies, defense team, prosecution, and testifying witnesses, as well as 15 jurors. And, although the court did not explicitly consider reasonable alternatives on the record, likely because no one objected to the courtroom's closure, the court implemented a reasonable alternative by streaming the trial to another room in the courthouse for members of the public unable to watch inside the courtroom. See *People v Sherrill*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 360133); slip op at 6-7 ("The trial court did not consider reasonable alternatives because there was no objection to the closure of the courtroom. However, 3d Circuit AO 2021-15 anticipated a reasonable alternative to viewing the trial in person because the trial was streamed over YouTube.").

The court also addressed issues that arose, including opening a second room for viewing when it was brought to the court's attention that family members of opposing sides were present. Finally, the court made minimal findings on the record explaining the general reasoning behind the courtroom closure. *Davis*, 509 Mich at 66-67.

---

[3] Return to Full Capacity Guidelines, https://www.courts.michigan.gov/49beea/siteassets/covid/covid-19/returntofullcapacityguide.pdf.

[4] See July 26, 2021 order of the Michigan Supreme Court in ADM File No. 2020-08.

We also reject defendant's assertion that his trial counsel rendered ineffective assistance by failing to object to the courtroom closure. "A criminal defendant has a fundamental right to the effective assistance of counsel." US Const, Am VI; Const 1963, art 1, § 20; *United States v Cronic*, 466 US 648, 654; 104 S Ct 2039; 80 L Ed 2d 657 (1984)." *People v Brown*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 359376); slip op at 10.

> To establish ineffective assistance of counsel, defendant must first establish that counsel's performance was deficient, which requires this Court to consider "whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *People v Leffew*, 508 Mich 625, 637; 975 NW2d 896 (2022). Defendant must also demonstrate that he was prejudiced by counsel's error. To establish prejudice, defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. (quotation marks and citation omitted). "Reasonable probability means 'a probability sufficient to undermine confidence in the outcome.' " *Id*. (citation omitted). [*People v Thurmond*, 348 Mich App 715, 740; 20 NW3d 311 (2023).]

And in contrast to our plain-error analysis of a forfeited public trial claim, "when a defendant raises a public-trial violation via an ineffective-assistance-of-counsel claim, . . . prejudice is not shown automatically." *Weaver*, 582 US at 300-301.

Even if we were to assume defense counsel performed deficiently by failing to object to the courtroom closure, for all of the reasons described above, defendant has not established prejudice such that but for counsel's failure to object, there was a reasonable probability that the outcome of trial would have been different. The record demonstrates that the court likely would have imposed the restrictions regardless, and the court implemented procedures to minimize any prejudice to defendant.

## III.  FLIGHT INSTRUCTION AND INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant next argues that the trial court erred when it gave the jury a flight instruction, and that trial counsel performed deficiently by failing to object to the instruction.

### A.  PRESERVATION AND STANDARDS OF REVIEW

"If a party fails to object to the trial court's instructions, then the party has failed to preserve the objection for appellate review." *People v Craft*, 325 Mich App 598, 605; 927 NW2d 708 (2018) (emphasis omitted). Whereas "[a] party's explicit and express approval of jury instructions as given waives any error and precludes appellate review." *People v Spaulding*, 332 Mich App 638, 653; 957 NW2d 843 (2020). Defense counsel participated in the formation of the jury instructions, and expressly approved the final jury instructions, thereby waiving any error for appellate review. Nevertheless, we consider the issue because of defendant's alternative argument of ineffective assistance of counsel.

Generally, "[w]e review a claim of instructional error involving a question of law de novo, but we review the trial court's determination that a jury instruction applies to the facts of the case for an abuse of discretion." *Craft*, 325 Mich App at 604 (quotation marks and citation omitted).

"However, unpreserved claims of instructional error are reviewed for plain error affecting substantial rights." *Spaulding*, 332 Mich App at 652-653.

With regard to ineffective assistance, "this Court's review is limited to mistakes apparent from the record," *Heft*, 299 Mich App at 80, because defendant did not move in the trial court for a new trial or an evidentiary hearing or move in this Court to remand for a *Ginther* hearing.

## B. ANALYSIS

The trial court did not err by giving the jury a flight instruction.

"A criminal defendant has the right to a properly instructed jury . . . ." *People v Montague*, 338 Mich App 29, 37; 979 NW2d 406 (2021) (quotation marks and citation omitted). "The jury instructions 'must include all the elements of the charged offense and any material issues, defenses, and theories that are supported by the evidence.' " *Montague*, 338 Mich App at 37-38, quoting *People v McKinney*, 258 Mich App 157, 162-163; 670 NW2d 254 (2003). "[J]ury instructions are reviewed in their entirety, and there is no error requiring reversal if the instructions sufficiently protected the rights of the defendant and fairly presented the triable issues to the jury." *Montague*, 338 Mich App at 38.

The trial court read the following flight instruction to the jury:

There has been some evidence that the Defendant tried to hide or hid after the alleged crime. This evidence does not prove guilt. A person may run or hide for innocent reasons such as panic, mistake, or fear; however, a person may also run or hide because of a consciousness of guilt. You must decide whether the evidence is true and, if true, whether it shows that the Defendant had a guilty state of mind.

Defendant argues that the evidence did not support this instruction, because he was found within 48 hours of the shooting, he took only six minutes to exit the mobile home after law enforcement's commands, and simply departing a crime scene is insufficient evidence of flight.

"[E]vidence of flight is admissible to show consciousness of guilt." *People v Compeau*, 244 Mich App 595, 598; 625 NW2d 120 (2001). Defendant is correct that mere departure from the scene of the crime is insufficient to support a flight instruction, *People v Hall*, 174 Mich App 686, 691; 436 NW2d 446 (1989), and Trooper Franklin Carpenter testified that there was no "extreme delay" with defendant's arrest, as defendant exited the mobile home five or six minutes after law enforcement made announcements and banged on the residence. But defendant's argument ignores additional evidence in the record supporting the flight instruction.

"The term 'flight' has been applied to such actions as fleeing the scene of the crime, leaving the jurisdiction, running from the police, resisting arrest, and attempting to escape custody." *People v Coleman*, 210 Mich App 1, 4; 532 NW2d 885 (1995). There is no evidence in the record that defendant attempted to help Wicks, or call for medical attention. Instead, Tremblay testified that following the shooting, she got into her car to leave the Prairie with other individuals, when defendant jumped into her car. She first drove to a location she said Dexter had told defendant to go, but then proceeded to drive defendant and the others to several locations, including a hotel near Romulus where they spent the night, and finally to a house the next day where everyone disbanded.

On April 1, law enforcement conducted an interview with Burnett, after which they executed a search warrant of her residence, where defendant was ultimately arrested. During the search of that residence, law enforcement located a cell phone linked to defendant that had been taken apart into pieces, with the SIM card found in the toilet. The cell phone had Internet searches related to the police investigation, which Detective Doerr interpreted as defendant trying to figure out whether a warrant for his arrest had been issued.

The above evidence supports a reasonable inference that defendant fled the scene and was attempting to evade arrest. *Coleman*, 210 Mich App at 4. That he failed just 48 hours after the shooting does not negate this inference, and the instruction given leaves room for the jury to weigh whether the evidence demonstrates consciousness of guilt. Accordingly, the instruction fairly presented the issue to the jury, *Montague*, 338 Mich App at 38, and the trial court did not err because sufficient evidence had been presented to support the instruction.[5] In turn, defendant's ineffective assistance of counsel argument fails, because counsel does not perform deficiently by not raising a meritless or futile objection. *Thurmond*, 348 Mich App at 741.

## IV. EVIDENTIARY ERROR

Defendant argues next that the trial court impermissibly admitted, under MRE 801(d)(1)(C), Detective Ryan Cramer's testimony that Palmer identified defendant as Wicks's killer during an interview with law enforcement.

## A. STANDARD OF REVIEW

As stated by this Court in *People v Jones*, ___ Mich App ___, ___; ___ NW3d ___ (2025) (Docket No. 362854); slip op at 3:

> A trial court's decision to admit evidence is reviewed for an abuse of discretion. *People v Propp*, 508 Mich 374, 383; 976 NW2d 1 (2021). A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *People v Dixon-Bey*, 321 Mich App 490, 496; 909 NW2d 458 (2017). "[W]hether a rule or statute precludes admission of evidence is a preliminary question of law that this Court reviews de novo." *Propp*, 508 Mich at 283.

---

[5] Defendant additionally asserts, in a footnote, that "[s]o suspect is the flight instruction that twenty-two states . . . forbid, disapprove, or severely limit the flight instruction." Not only is the law from other jurisdictions not binding on this Court, *People v DeBono*, 346 Mich App 64, 70 n 2; 11 NW3d 546 (2023), but defendant ignores that the *majority* of states and jurisdictions, like Michigan, do allow flight instructions. See, e.g., *State v Cooper*, 353 Conn 510, 561; 343 A3d 465 (2025); *State v Aekins*, 2023-Ohio-322; 207 NE3d 934, 968-970 (Ohio App, 2023); *United States v Mireles*, 116 F4th 713, 726-727 (CA 7, 2024). Most states, like Michigan, allow a jury to consider evidence that a defendant fled to determine whether it showed a consciousness of guilt.

B. ANALYSIS

The trial court did not abuse its discretion when it admitted Detective Cramer's testimony regarding Palmer's prior statement of identification.

"Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." *People v Johnson*, 315 Mich App 163, 193; 889 NW2d 513 (2016) (quotation marks omitted), citing MRE 801(c).[6] "Hearsay is generally not admissible unless an exception to the rule applies." *Johnson*, 315 Mich App at 193.

For example, under MRE 801(d)(1), a witness's prior statement is not hearsay if the declarant testifies at the trial and is subject to cross-examination concerning the statement, and the statement is:

(A) inconsistent with the declarant's testimony, and was given under oath or subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition, or

(B) consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive, or

(C) one of identification of a person made after perceiving the person. [MRE 801(d)(1).]

In response to defense counsel's objection to Detective Cramer's testimony, the prosecutor asserted admissibility of the testimony as a statement of identification under MRE 801(d)(1)(C), and the trial court overruled the objection. Defendant argues on appeal that MRE 801(d)(1)(C) does not apply to Palmer's interview statement identifying defendant as Wicks's shooter because the statement was not made to Detective Cramer after Palmer perceived defendant in an identification setting like a photographic array or lineup. In doing so, he cites a treatise on evidence, and two cases apparently noted by the committee considering MRE 801(d)(1)(C). But neither holds that MRE 801(d)(1)(C) applies *only* to identification statements made in a specific identification setting or procedure. See *People v Poe*, 388 Mich 611; 202 NW2d 320 (1972); *People v Londe*, 230 Mich 484; 203 NW 93 (1925). Nor have we found any caselaw to that effect. And the rule itself does not contain such a limitation.

Rather, Detective Cramer's testimony regarding Palmer's prior statement of identification—that defendant shot Wicks—was admissible nonhearsay under MRE 801(d)(1)(C).

---

[6] "The Michigan Rules of Evidence were substantially amended on September 20, 2023, effective January 1, 2024. See 512 Mich lxiii (2023). Analysis of evidentiary issues in this opinion will follow the version of the rules in effect at the time of trial." *Jones*, ___ Mich App at ___; slip op at 3 n 3.

-12-

Palmer's statement to Detective Cramer was one of identification made after perceiving defendant, and Palmer testified at trial and was subject to cross-examination. See *People v Sykes*, 229 Mich App 254, 266-267; 582 NW2d 197 (1998) (under MRE 801(d)(1)(C), "third-party testimony of an out-of-court statement of identification by an identifier/declarant is substantive nonhearsay evidence and is admissible even if it goes beyond the simple facts and circumstances of the prior out-of-court statement of identification–if the identifier/declarant testifies and is subject to cross-examination").[7]

## V. PROSECUTORIAL ERROR

Defendant argues that the prosecutor made a number of statements during rebuttal closing argument that amount to prosecutorial misconduct, as the challenged statements personally attacked defense counsel, and implied that defense counsel was trying to mislead the jury. He asserts the prosecutor's statements were outcome-determinative and seriously affected the fairness and integrity of the proceedings because this was a close case with credibility issues, and the statements made defense counsel out to be a shyster.

### A. PRESERVATION AND STANDARD OF REVIEW

"To preserve a claim of prosecutorial error,[8] a defendant must timely and specifically challenge the prosecutor's statement or conduct." *Thurmond*, 348 Mich App at 735, citing *People v Unger*, 278 Mich App 210, 234-235; 749 NW2d 272 (2008). As defendant acknowledges, he did not object to the prosecutor's challenged statements. Therefore, his prosecutorial-error argument is unpreserved. "We review unpreserved claims of prosecutorial error for plain error affecting defendant's substantial rights." *Thurmond*, 348 Mich App at 736.

### B. ANALYSIS

The prosecutor's challenged statements, although improper on their face, do not amount to plain error requiring reversal.

Because "[t]he prosecution's primary responsibility is to seek justice, rather than to secure a conviction," "the test for prosecutorial error is whether the defendant was denied a fair and impartial trial." *People v Wisniewski*, ___ Mich App ___, ___; ___ NW3d ___ (2025) (Docket

---

[7] Because we have held that the trial court did not err by admitting Detective Cramer's testimony under MRE 801(d)(1)(C), we need not address the prosecution's argument that the statement was also admissible under MRE 801(d)(1)(B).

[8] Defendant refers to the prosecutor's action as "misconduct." Although "prosecutorial misconduct" is a commonly accepted term of art in criminal appeals, it is a misnomer when referring to allegations that do not involve violations of the rules of professional conduct or unethical activity. *People v Cooper*, 309 Mich App 74, 87-88; 867 NW2d 452 (2015). Less egregious conduct involving inadvertent or technical error should be deemed "prosecutorial error." *Id*. at 88. Defendant does not allege a violation of the rules of professional conduct or illegal activity by the prosecutor. Therefore, we refer to defendant's allegations using the term "prosecutorial error."

No. 361978); slip op at 13. "While the prosecution is precluded from arguing facts not in evidence or mischaracterizing the evidence presented, the prosecution is free to argue all reasonable inferences that arise from the evidence." *Id.* at ___; slip op at 13.

A " 'prosecutor may not suggest that defense counsel is intentionally attempting to mislead the jury.' " *Unger*, 278 Mich App at 236, quoting *People v Watson*, 245 Mich App 572, 592; 629 NW2d 411 (2001). Nor may a prosecutor

> question defense counsel's veracity. When the prosecutor argues that the defense counsel himself is intentionally trying to mislead the jury, he is in effect stating that defense counsel does not believe his own client. This argument undermines the defendant's presumption of innocence. [*Unger*, 278 Mich App at 236 (quotation marks and citation omitted)].

"However, the prosecutor's comments must be considered in light of defense counsel's comments. An otherwise improper remark may not rise to an error requiring reversal when the prosecutor is responding to defense counsel's argument." *Watson*, 245 Mich App at 592-593 (quotation marks, citations, and alteration omitted). The prosecutor's challenged statements, made during rebuttal argument, may have been improper on their face, as some of the statements explicitly accused defense counsel of attempting to mislead the jury and misrepresent evidence, but the statements were made in direct response to defense counsel's closing arguments.

Defendant first challenges the prosecutor's statement that: "There are countless, countless times throughout [defense counsel's] recitation where he is flat-out incorrect, and he does that on purpose. He does it on purpose to draw your sight off the true and correct evidence." But, the prosecutor made this comment in reference to defense counsel's argument that defendant's cell phone data placed him at the Prairie on the day of Wicks's shooting, but not at Quality Dairy that same morning, where he was photographed. Specifically, the prosecutor explained:

> At no point did anybody testify that it is a real-time, always-on tracking of a cell phone. In fact, what it shows is each time the phone is used. So when he gets up here and he seems to suggest to you that [defendant] must have left his cell phone behind when he went to Quality Dairy, that's because he doesn't understand the evidence and that he's trying to present it to you in an incorrect fashion.

And a review of the testimony supports the prosecutor's response. Detective Derick Ward testified that when a call is made, the phone connects with a cell tower. Additionally, Melissa Redshaw, a crime and intelligence analyst for the Michigan State University Police Department, testified that when law enforcement obtains cell phone records, those records include which cell towers a phone was using when that phone is used for communication. Further, she stated: "Not everything will have a tower associated with it. Like text messages, typically you won't get location information for text messages. Typically for every call you will get the tower that they were using." When asked if a phone can be mapped when it is turned off or does not have power, Redshaw said no, that there would have to be a communication, which would include an incoming call.

The following challenged statements were also made by the prosecutor in direct response to statements made by defense counsel in his closing argument:

-14-

The entire argument from the Defense mischaracterized every bit of what I said on closing. The uncontroverted evidence, the credible evidence starts here, but he wants to ignore that? He didn't touch a single bit of it.

Again, I understand that he was bored with it, that he didn't pay attention to it at the beginning. And why? Why is that the case? Because it damns his client. It points to his client. It filters right into his client.

He bought the Defense strategy hook, line, and sinker. Ignore the good stuff. Go after the people. That's why he spent so much time on his closing mischaracterizing, twisting every bit, every word that I said.

Indeed, defense counsel aggressively challenged the credibility of the evidence, stating that no credible evidence supported convicting defendant, and calling the prosecution's witnesses idiots and liars. Further, defense counsel described the physical evidence as "mind-numbingly scintillating." Accordingly, defense counsel had already attacked the prosecutor's witnesses and the veracity of the prosecutor himself, and the prosecutor was responding to those attacks.

The same is true with regard to the prosecutor's following rebuttal statements referencing specific witnesses:

[Lisa Burgess's] complete testimony was [defendant] was also upset [about the drive-by shooting]. And when was he upset? When he, [defendant], was showing Ms. Burgess the bullet holes in his window from the drive-by. Oh, [defense counsel] left that part out. Why? Why did he leave that part out? We know why. Because it damns his client.

He did it with Mr. Palmer. He wants to have you believe that Mr. Palmer had these series of multiple interviews. Wrong again. That's how he's twisted it throughout the case. That's how he's asked his questions of the witness. And then when he uses it, when he presents it incorrectly, then he tries to use their answers against them.

There were only two. But if you listen to the Defense's theory, there are these multiple interviews with multiple different answers. Wrong. Wrong, wrong, wrong.

He did it with Dexter. Same thing. There is a distinct difference between the proffer agreement and the plea agreement, but it doesn't serve his narrative. It doesn't serve his argument if they're separate because the reality is the proffer, as Mr. Dexter testified to, offered him nothing. He was given no benefit.

The prosecutor's comments were made in response to defense counsel's arguments that Burgess testified that Dexter, rather than defendant, was upset about the drive-by shooting, and that Dexter testified against defendant because he was incentivized to do so by his proffer agreement with the prosecution. The evidence supports the prosecutor's statements. Burgess testified that although he was not ranting and raving about the drive-by shooting like Dexter when she was at the Prairie on March 29, defendant was also upset, and showed Burgess a bullet hole in

the window in his bedroom. Additionally, on redirect examination, Dexter clarified that the proffer agreement he entered into did not guarantee him anything, and was signed several months before he entered into a plea agreement. With regard to the prosecutor's statements about defense counsel's characterization of Palmer's testimony, regardless of how many law enforcement interviews Palmer participated in, the testimony shows that Palmer only withheld his identification of defendant as the shooter at one of those interviews, and defense counsel attacked Palmer's credibility on this basis in his closing argument, and stated that Palmer told multiple different stories to law enforcement.

Next, defendant challenges several statements made by the prosecutor that defense counsel withheld information from the jury by cherry-picking the evidence that supported his arguments, and argued to the jury that the physical evidence presented during trial was meaningless. But, again, defense counsel, at many points throughout his closing argument, attacked the evidence presented by the prosecutor, including the physical evidence, and asserted that the prosecutor tried to "twist" the evidence to support his arguments. And when referring to witness testimony, defense counsel stated: "[The prosecutor] tries to make it sound like it's incontroverted [sic]. He tries to make it sound like they're consistent. And we know that that is horse crap."

As to the prosecutor's statements that defense counsel discussed Palmer's possession of a .45-caliber gun during closing argument to allude that Palmer may have been the shooter in an effort to draw the jury's attention away from actual evidence, the statements are similar to those made by defense counsel attacking the prosecutor's presentation and characterization of the evidence presented, as cited to above. And, although we do not see where during closing argument defense counsel referred to a .45-caliber firearm specifically, defense counsel did state: "Why would Palmer say, 'I saw the last shot.' Maybe he did. Maybe he did because he delivered that last shot -- that and the other shots -- in rapid succession." Further, the prosecutor is correct that beyond testimony that Palmer possessed a firearm on the day of the shooting, there is no evidence in the record that Palmer shot Wicks.

Finally, defendant challenges the prosecutor's statement that defense counsel referred to the witnesses as idiots in an effort to show that defendant was not guilty, stating further, "what [defense counsel's] saying is so long as we commit a crime, so long as we kill somebody in front of these types of people, we will never hold anybody accountable." These statements are in direct response to defense counsel's many statements that the witnesses who testified at trial cannot reasonably be believed, in great part, due to the fact that they are idiot drug addicts.

Nevertheless, even if the prosecutor's statements were improper suggestions that defense counsel was attempting to mislead the jury, *Unger*, 278 Mich App at 236, despite defense counsel's own statements during closing argument, reversal is not required. The trial court instructed the jury that: "The lawyers' statements and arguments are not evidence. They are only meant to help you understand the evidence and each side's legal theories. You should only accept things the lawyers say that are supported by the evidence or by your own common sense and general knowledge." And jurors are presumed to following the jury instructions. *People v Zitka*, 335 Mich App 324, 348; 966 NW2d 786 (2020). Further, a timely objection and curative instruction could have alleviated any prejudice caused by the prosecutor's improper comments. See *People v Aikens*, ___ Mich App ___, ___; ___ NW3d ___ (2025) (Docket No. 368187); slip op at 3 ("Under the plain-error standard, this Court will not find error requiring reversal if the prejudicial effect of

-16-

the prosecutor's comments could have been cured by a timely instruction.") (quotation marks and citation omitted); *Zitka*, 335 Mich App at 348 (jury instructions are presumed to cure most errors).

## VI. SENTENCING

Finally, defendant argues that his "de facto life sentence" is disproportionate and violates the Michigan and federal constitutional prohibitions against cruel and/or unusual punishment.

## A. PRESERVATION AND STANDARD OF REVIEW

"There are no special steps that a defendant must take to preserve the question whether the sentence was proportional; a defendant properly presents the issue for appeal by providing this Court a copy of the presentence investigation report [(PSIR)]." *People v Walden*, 319 Mich App 344, 350; 901 NW2d 142 (2017). As we have received the PSIR, defendant has preserved the argument that his sentence was disproportionate.

On the other hand, "[t]o preserve a claim that the defendant's sentences were unconstitutionally cruel or unusual, the defendant must raise the claim in the trial court." *People v Burkett*, 337 Mich App 631, 635; 976 NW2d 864 (2021). Defendant failed to raise the argument in the trial court, leaving the issue unpreserved.

" '[T]he standard of review to be applied by appellate courts reviewing a sentence for reasonableness on appeal is abuse of discretion.' " *Dixon-Bey*, 321 Mich App at 520, quoting *People v Steanhouse*, 500 Mich 453, 471; 902 NW2d 327 (2017) (alteration in original). "In *Steanhouse*, the Michigan Supreme Court clarified that 'the relevant question for appellate courts reviewing a sentence for reasonableness' is 'whether the trial court abused its discretion by violating the principle of proportionality . . . .' " *Dixon-Bey*, 321 Mich App at 520, quoting *Steanhouse*, 500 Mich at 471.

Because defendant failed to preserve his argument that his sentence was cruel or unusual, plain error review applies. See *Burkett*, 337 Mich App at 635.

## B. ANALYSIS

We hold that defendant's sentence was neither disproportionate nor cruel and/or unusual.

Defendant's sentencing guidelines range for his second-degree murder conviction was 365 to 900 months' imprisonment or life with the possibility of parole, and the court imposed a sentence of 600 to 800 months' imprisonment, plus 30 to 60 months' imprisonment for his felon-in-possession conviction, and two years' imprisonment for each of his felony-firearm convictions. Thus, defendant's sentence for second-degree murder was within his sentencing guidelines range.

In *People v Posey*, 512 Mich 317, 326; 1 NW3d 101 (2023), the Court held "that on appeal, challenges to within-guidelines sentences are reviewed for reasonableness according to the test outlined in *Steanhouse*."

"[T]he proper inquiry when reviewing a sentence for reasonableness is whether the trial court abused its discretion by violating the 'principle of proportionality' set

forth in *People v Milbourn*, 435 Mich 630, 636; 461 NW2d 1 (1990), 'which requires sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender.' " [*People v Posey (On Remand)*, 349 Mich App 199, 203-204; 27 NW3d 137 (2023), quoting *Steanhouse*, 500 Mich at 459-460.]

"The guidelines remain important as an advisory resource for sentencing courts and continue to be a 'highly relevant consideration' on appeal." *Posey*, 512 Mich at 352. As stated by this Court in *Posey (On Remand)*, 349 Mich App at 204:

"An appropriate sentence should give consideration to the reformation of the offender, the protection of society, the discipline of the offender, and the deterrence of others from committing the same offense." *People v Boykin*, 510 Mich 171, 183; 987 NW2d 58 (2022). With respect to sentencing and the guidelines, the key test is not whether a sentence departs from or adheres to the guidelines range. *Steanhouse*, 500 Mich at 472. The key test is whether the sentence is proportionate to the seriousness of the matter. *Id*. In regard to proportionality, the *Milbourn* Court "observed that the Legislature has determined to visit the stiffest punishment against persons who have demonstrated an unwillingness to obey the law after prior encounters with the criminal justice system." *Milbourn*, 435 Mich at 668. "The premise of our system of criminal justice is that, everything else being equal, the more egregious the offense, and the more recidivist the criminal, the greater the punishment." *People v Babcock*, 469 Mich 247, 263; 666 NW2d 231 (2003). [*Posey (On Remand)*, 349 Mich App at 204.]

When challenging a within-guidelines sentence, there is a presumption of proportionality "through which the defendant bears the burden of demonstrating that their within-guidelines sentence is unreasonable or disproportionate[.]" *Posey*, 512 Mich at 359. "[T]o overcome the presumption that the sentence is proportionate, a defendant must present unusual circumstances that would render the presumptively proportionate sentence disproportionate." *People v Bowling*, 299 Mich App 552, 558; 830 NW2d 800 (2013) (quotation marks and citation omitted).

The trial court did not abuse its discretion by imposing a sentence of 600 to 800 months' imprisonment for defendant's second-degree murder conviction. The trial court set forth the proportionality factors to be considered, and made findings based upon those factors. In considering the circumstances of the offense, the trial court found that defendant committed an "execution-type murder," which the record evidence supports, and acknowledged defendant's criminal history. Indeed, although defendant may have served in the Naval Reserve and suffered from mental illnesses, as he asserts on appeal, the prosecution accurately points out that defendant has an extensive criminal history, beginning as a juvenile and continuing through adulthood, including charges for assault with intent to rob while carrying a concealed weapon, felony possession of methamphetamine, and misdemeanor domestic violence. He was also on bond for charges of assault with intent to murder and assault with a dangerous weapon at the time he committed the present offense. Defendant asserts that his sentence does little to protect society and is unlikely to have any deterrence value, but in doing so, only states generally that society can be protected in better ways than imprisonment and that studies show the length of a sentence has

little impact on an individual's decision to commit a crime. Those general arguments would apply to any offender, and do little to convince this Court that defendant's sentence was disproportionate. Defendant also argues that the guidelines allow for no consideration of mitigating variables, but it is well established that the guidelines are advisory only. *Posey (On Remand)*, 349 Mich App at 206.

Finally, defendant characterizes his sentence for second-degree murder as a "de facto life sentence," and argues that while the sentence fell "within the Guidelines range, it is not proportionate to the circumstances of the offense and the offender." But, "a defendant's age is insufficient to overcome the presumption of proportionality, especially when considered in light of a defendant's criminal record and the gravity of his offenses," *People v Purdle (On Remand)*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 353821); slip op at 5-6, as described above.

In addition to arguing that his sentence his disproportionate, defendant asserts that his sentence violates the Michigan and federal constitutional prohibitions against cruel and/or unusual punishment.

> "The Michigan Constitution prohibits cruel *or* unusual punishment, Const 1963, art 1, § 16, whereas the United States Constitution prohibits cruel *and* unusual punishment, US Const, Am VIII." *People v Benton*, 294 Mich App 191, 204, 817 NW2d 599 (2011). "If a punishment passes muster under the state constitution, then it necessarily passes muster under the federal constitution." *Id*. (cleaned up). "[U]nder the Michigan Constitution, the prohibition against cruel or unusual punishment include[s] a prohibition on grossly disproportionate sentences." *Id*. [*Burkett*, 337 Mich App at 636 (alterations and emphasis in original).]

To determine whether a punishment is cruel or unusual, the Court must consider:

> (1) the severity of the punishment relative to the gravity of the offense, (2) punishments imposed in the same jurisdiction for other offenses, (3) punishments imposed in other jurisdictions for the same offense, and (4) Michigan's traditional goal of and preference for rehabilitation. [*People v Taylor*, ___ Mich ___, ___; ___ NW3d ___ (2025) (Docket Nos. 166428 and 166654); slip op at 8-9.]

Defendant analyzes these factors in his appellate brief, essentially arguing that his "de facto life sentence" is out of line with the penalties imposed on other criminals in Michigan, and the sentences imposed by other jurisdictions for the same crime. But, as explained above, defendant's criminal history and the circumstances of the crime support his sentence, and his age is insufficient to overcome the presumption of proportionality. And, "a proportionate sentence is not cruel or unusual." *Bowling*, 299 Mich App at 558. Accordingly, the trial court did not plainly err when it imposed defendant's sentence for second-degree murder.

Affirmed.

/s/ Daniel S. Korobkin
/s/ Christopher M. Murray
/s/ Allie Greenleaf Maldonado